**In the Matter of the ESTATE Of Charles MEYERS, Deceased.**

**T. Fred COLLINS, Personal Representative of the Estate of Charles Meyers, Deceased, Appellant,**

v.

**Florence A. MEYERS, Appellee.**

No. 61317.

Supreme Court of Oklahoma.

Oct. 22, 1985.

As Corrected Nov. 27, 1985.

Concurring in Part and Dissenting in Part Dec. 3, 1985.

Rehearing Denied Dec. 3, 1985.

Collins & Collins, Inc. by Lorenzo T. Collins, Ardmore, for appellant.

Hester, Roberts & Gardner, by Michael J. Hester, Ardmore, for appellee.

ALMA WILSON, Justice.

We are today asked to consider the operation and effect of an uncontested antenuptial agreement to waive or bar a contracting spouse's subsequent adverse claim to a probate homestead and probate allowance as against present vestment of the deceased spouse's separate property in the decedent's testamentary heirs.

The facts before us establish that on January 14, 1983, Charles Meyers (Decedent), an eighty-one year old widower, executed his Last Will and Testament. Decedent directed that following his death, all of the property, real, personal or mixed, of which he died seized and possessed or to which he held any right, title or interest and wheresoever situated, shall be sold and converted into lawful money of the United States of America. After declaring an intention to marry Florence A. Royce (Appellee), a widow of seventy years of age, Decedent made the following bequest to his betrothed:

"If the said FLORENCE A. ROYCE survives me as my lawful widow, *pursuant to the terms of an Antenuptial Agreement which is contemplated to be signed by us,* I do hereby give her the sum of Twenty-Five Thousand ($25,000) Dollars. If the said FLORENCE A. ROYCE does not survive me as my lawful widow, then this bequest shall fail and it shall become a part of my residuary estate." [emphasis added.]

Decedent thereafter made a bequest of 10% of his remaining estate to the Youth Department of the First United Methodist Church of Ardmore, Oklahoma, and successive descending percentages unto the heirs of Decedent and his late wife, Maude Agnes Meyers, according to degree of familial relationship.

On January 19, 1983, Decedent and Appellee entered into the following Antenuptial Agreement:

ANTENUPTIAL AGREEMENT

THIS AGREEMENT made January 19, 1983 between CHARLES MEYERS of Ardmore, Oklahoma, and FLORENCE A. ROYCE of Long Beach, California.

WHEREAS, CHARLES MEYERS and FLORENCE A. ROYCE intend to be married within a short time, and

WHEREAS, CHARLES MEYERS has disclosed to FLORENCE A. ROYCE the nature and extent of his various property interests and of his sources of income, and

WHEREAS, CHARLES MEYERS desires to make a reasonable and sufficient provision for FLORENCE A. ROYCE in release of and in full satisfaction of all rights which after the solemnization of their marriage FLORENCE A. ROYCE might or could have, by reason of the marriage, in the property which CHARLES MEYERS now has or may hereafter acquire, or in his estate upon his death, and

WHEREAS, FLORENCE A. ROYCE desires to accept this provision in lieu of all rights which she would otherwise acquire, by reason of the marriage, in the

property or estate of CHARLES MEYERS,

IT IS THEREFORE AGREED THAT:

## I.

### RELEASE OF DOWER

CHARLES MEYERS shall hold all real property which he now owns or may hereafter acquire free from any claim of dower, inchoate or otherwise, on the part of FLORENCE A. ROYCE, and this agreement shall evidence the right of CHARLES MEYERS to convey any of his real estate free from any such claim of dower. At the request of CHARLES MEYERS, FLORENCE A. ROYCE shall execute, acknowledge, and deliver such other instruments as may be reasonably required to accomplish the transfer by CHARLES MEYERS of any of his real property free from any such claim of dower or to divest any claim of dower in such property.

## II.

### PAYMENT FROM ESTATE

If FLORENCE A. ROYCE survives CHARLES MEYERS as his lawful widow, there shall be paid to her from the estate of CHARLES MEYERS, free from all estate, inheritance, succession, or other death taxes, the sum of Twenty-Five Thousand ($25,000) Dollars. Such sum shall be paid to FLORENCE A. ROYCE as soon after the death of CHARLES MEYERS as may be practicable, but in no event later than one (1) year after his death. Until so paid, such sum shall constitute a charge upon the entire estate of CHARLES MEYERS.

## III.

### RELEASE OF MARITAL RIGHTS

*FLORENCE A. ROYCE shall accept the payment provided for her in Paragraph II in release and in full satisfaction of all rights which, by reason of the marriage, she may acquire in the property or estate of CHARLES MEYERS, and in consideration thereof, she does hereby waive and relinquish all rights which, as widow of CHARLES MEYERS, she would otherwise acquire in his property or estate, under the law now or hereafter in effect in any jurisdiction, whether by way of dower, distributive share, right of election to take against a will, widow's allowance, or otherwise.* [emphasis added.]

## IV.

### DISCLOSURE OF FACTS

FLORENCE A. ROYCE acknowledges that the present approximate net worth of CHARLES MEYERS has been fully disclosed to her, that she understands that such net worth is approximately Two Hundred Thousand ($200,000) Dollars, that she has given consideration to these facts, that she has had the advise of independent counsel, and that she is entering into this agreement freely and with a full understanding of its provisions.

## V.

### EFFECTIVE DATE

This agreement shall come into effect only if the contemplated marriage between CHARLES MEYERS and FLORENCE A. ROYCE is solemnized, and upon coming into effect *shall bind, and inure to the benefit of, the parties and their respective heirs, executors, and administrators.* [emphasis added.]

IN WITNESS WHEREOF, the parties have signed, sealed and acknowledged this instrument.

/s/ _____

CHARLES MEYERS

/s/ _____

FLORENCE A. ROYCE

Witnesses:

/s/_____

There is no dispute with respect to the facts and circumstances surrounding the actual execution of the Antenuptial Agree-

ment. There is no suggestion of fraud, overreaching or undue influence; nor is it asserted that the prospective spouses had not the capacity to contract one with the other. The abbreviated record discloses only that at the ages of eighty-one and seventy, respectively, Decedent and Appellee renewed their acquaintance of some forty-seven years previously in the summer of 1982 after the decease of both their spouses. The couple subsequently decided to marry. At that time Decedent owned a home in Ardmore, Oklahoma. Appellee rented an apartment in Long Beach, California. Decedent's property holdings, real and personal, amounted to approximately $200,000. Appellee held property and/or monies valued at approximately $19,000. Neither party had minor nor dependent children. As a prelude to their marriage, the couple entered into the subject antenuptial marriage contract on January 19, 1983. The contract, corresponding to Decedent's Last Will and Testament, was prepared by the Decedent's attorney in Ardmore, Oklahoma and signed in the home of and in the presence of Appellee's niece and nephew in El Centro, California. Decedent and Appellee were married on January 22, 1983 and shortly thereafter resided in Decedent's Ardmore home until his death on September 23, just eight months later.

On October 14, 1983, Decedent's Will was admitted to probate. At the probate hearing, the trial court also admitted, without objection, the Antenuptial Agreement executed by the parties. This appeal is taken by Decedent's personal representative from the trial court's order sustaining Appellee's petition for a probate allowance in the amount of $750 per month from Decedent's estate, as well as lifetime occupancy of the Ardmore home. Appellee does not contest the validity of the Antenuptial Agreement, but relies solely upon the propositions that (1) antenuptial waiver of a surviving spouse's right to continued occupation of the marital homestead after the death of either husband or wife is void as against public policy; and (2) antenuptial waiver of an allowance to the surviving spouse from a deceased spouse's estate

during the pendency of probate proceedings is likewise void as against public policy.

## I.

Antenuptial waiver of the probate homestead appeared before this Court in *In Re Estate of Cole*, 85 Okl. 69, 205 P. 172 (1922). In that early case, the Court acknowledged the binding effect of antenuptial contracts fairly made by parties competent to contract, but voided as against public policy the provisions of a particular antenuptial agreement which, by its terms, purported to deprive the surviving spouse of the probate homestead exemption by virtue of a nonspecific, general waiver "that the property of each [prospective spouse] shall remain their separate and individual property and that the other shall not have any interest therein." *In Re Estate of Cole*, above, has been cited with approval numerous times in regard to attempted *testamentary disposition* of the homestead in cases not involving express waiver by antenuptial agreement. *See, e.g., In re Estate of Wallace*, 648 P.2d 828 (Okl.1982); *Kemp v. Turnbull*, 198 Okl. 27, 174 P.2d 384 (1946); *In re Estate of Carothers*, 196 Okl. 640, 167 P.2d 899 (1946); *Scott v. Scott*, 131 Okl. 144, 268 P. 245 (1928). More recently, however, this Court stated that *unless* voluntarily waived or abandoned, the probate homestead exemption stands between the surviving spouse and all the world. *In re Estate of Wallace, supra.* Thus, being a personal and individual right, we have recognized that it may be waived, forfeited or abandoned, or lost by death. This determination necessarily depends upon the particular contract at issue, if any, and the facts and circumstance shown to exist in a particular case. In view of the various ways in which the homestead exemption can be waived, we cannot say that in this state there is presently any paramount public policy adverse to express waiver, provided there are no minor or dependent children involved. The spirit and purpose of the probate home-

stead exemption[1] is not *per se* prohibitive to the enforceability of an individual's contract expressly and voluntarily waiving his or her individual right to attachment of the probate homestead after full disclosure, at least where no minor or dependent children are involved. Daily, parties for valid consideration, contractually mortgage their constitutional homestead. The *probate* homestead exemption is no less and no more inviolate from purely voluntary waiver than the *constitutional* homestead exemption[2] when accomplished clearly and specifically. In the present case, however, express waiver was not accomplished. As in *Cole, supra,* the attempted antenuptial homestead waiver herein fails by reason of insufficient specificity to effectuate a valid waiver. While this Court recognizes there can be no immediate liquidation of the estate herein, and that a significant portion of Decedent's estate may consequently be incapable of administration for the life of the holder of the probate homestead, the danger sought to be thwarted by a prohibition against implicit, general waiver is compelling. We therefore affirm that portion of the trial court's order setting aside the homestead in favor of Appellee.

## II.

The provision for an allowance to the surviving spouse during the pendancy of probate proceedings is contained in 58 O.S. 1981, § 314:

[T]he court may in its discretion make such reasonable allowance out of the estate as shall be necessary for the maintenance of the family, according to their circumstances during the progress of the settlement of the estate.... [emphasis added.]

Relying upon this provision, the probate court awarded Appellee an allowance of $750 per month out of Decedent's estate, notwithstanding Appellee's express waiver of a widow's allowance in the Antenuptial Agreement, *supra,* for a consideration of $25,000.

The judicial interpretation prohibiting antenuptial waiver of the probate allowance in Oklahoma was first set out in *In Re Estate of Rossiter,* 191 Okl. 342, 129 P.2d 856 (1942):

Considering the question involved, in the light of our statutes and decisions, we think that the reasoning and the conclusions reached by the Iowa Supreme

---

1. The probate homestead originates by force of statute, 58 O.S.1981, § 311, supra, provides: "Upon the death of either husband or wife, the survivor *may* continue to possess and occupy the whole homestead, which shall not in any event be subject to administration proceedings, except as in this title provided, *until it is otherwise disposed of according to law;* and upon the death of both husband and wife the children may continue to possess and occupy the whole homestead until the youngest child becomes of age. The title to the land set apart for the homestead property shall pass, subject to the right of homestead, the same as other property of the decedent and shall be included in the decree of distribution. And in addition thereto, the following property must be immediately delivered by the executor or administrator to such surviving wife or husband, and child or children, and is not to be deemed assets, namely: 1. All family pictures. 2. A pew or other sitting in any house of worship. 3. A lot or lots in any burial ground. 4. The family Bible and all school books used by the family, and all other books used as part of the family library, not exceeding in value of One Hundred ($100.00) Dollars. 5. All wearing apparel and clothing of

the decedent and his family. 6. The provisions for the family necessary for one year's supply, either provided or growing, or both; and fuel necessary for one year. 7. All household and kitchen furniture, including stoves, beds, bedsteads and bedding. No such property shall be liable for any prior debts or claims whatever."

2. This Court takes notice of the distinction between the *constitutional homestead,* provided by Okl. Const. art. XII, § 1, and the *probate homestead,* provided by 58 O.S.1981, § 311. "[W]e should not confuse the exemption rights given to a surviving spouse. The exemption rights are intended to protect the head of a family against creditors only, while the right to occupy a homestead is a special individual right given to a surviving spouse and intended to protect such survivor against all persons, except holders of liens expressly made enforceable by statute. The exemption right stands between the head of a family and his creditors alone, but the right of occupancy of a homestead by a surviving spouse stands between such survivor and all the world *unless,* with the above exception *it is voluntarily waived." In re Estate of Gardner,* 122 Okl. 26, 250 P. 490, 492 (1926).

Court expresses the better rule: that the case of the widow and/or children during the administration of the estate is a matter of public concern and that any provision by contract between the parties, which attempts to negative, either by express words or by implication, the statutory provision therefor and to supercede the discretion of the county court in the premises, is ineffectual and void as against public policy; and that therefore a prospective wife cannot waive or cut off her right to a widow's allowance under § 1226, supra, by a provision in an antenuptial contract. *Id.* at 859.

The Iowa case the Court referred to in its holding is *In re Estate of Johnson,* 154 Iowa 118, 134 N.W. 553 (1912). The Court quoted from the case extensively, including this excerpt:

It is undeniable law that a party may waive the advantage of a statute intended for his sole benefit, but there are grave reasons why a law enacted from public considerations, should not be abrogated by mere private agreement. The statute we are considering is of this character. *It was intended to throw around the persons named that protection they are unable, in their helplessness, to procure for themselves.* This is not a matter for mere private concern. It would be in contravention of the policy of this enactment to permit a party, by an antenuptial contract, to relieve his estate altogether from the maintenance of his widow and children, when they could no longer sustain themselves. *Rossiter,* 129 P.2d at 858. [emphasis added.]

Finally, the Court, in making its decision noted that *Rossiter* is contrary to the majority position in this country:

The majority rule, as announced by other jurisdictions, is that the right to a widow's allowance may be waived or relinquished by an antenuptial agreement that expressly or by necessary implication includes such a right.

The minority view is to the effect that under no circumstances can a wife, by an antenuptial contract, deprive herself of the right to a widow's allowance. (citations omitted) *Id.* at 858–59.

■ Since the decision in *Rossiter,* this Court has had little opportunity to review its previous decision. *Rossiter* has been cited only rarely, primarily in situations where the antenuptial agreement as a whole was claimed to be void. We believe the judicially created policy of *Rossiter* is now due for reassessment. The paternalistic attitude toward women which spawned *Rossiter* and its progeny no longer forms a sound policy basis for denying prospective spouses, (male or female) the freedom to contract in relation to his or her property, and the right to dispose of it as he or she sees fit. The policy declared by *Rossiter* is not *required* by statute nor by the Constitution. This Court bears the responsibility to change a judicially created rule which in our changing society no longer serves the ends of justice. *See, Unah v. Martin,* 676 P.2d 1366 (Okl.1984). We today adopt the position of a majority of jurisdictions in this nation permitting antenuptial waiver of the probate allowance by the beneficiary thereof provided no minor or dependent children are involved and such waiver is clear and express and supported by adequate consideration. *See, e.g., In re Estate of Schwarzwalter,* 47 Wash.2d 119, 286 P.2d 699, 701 (1955); *In re Estate of Place,* 166 Kan. 528, 203 P.2d 132, 135 (1949).

■ The agreement in the instant case · between Decedent and Appellee specifically waives any "widow's allowance" for a consideration of $25,000. Inasmuch as no minor or dependent children are here involved and there appearing to be no other reason that the valid contract of the parties should not be enforced, it will serve as a bar to the Appellees' subsequent claim of right to an allowance from Decedent's estate. An allowance to Appellee under these circumstances constitutes an unjustified drain on Decedent's estate which operates to the substantial detriment of Decedent's testamentary heirs. This is especially true here since Decedent has made consensual provision for Appellee in lieu thereof. That portion of the probate court's order grant-

ing Appellee an allowance of $750 per month from Decedent's estate is therefore reversed.

For the reasons stated herein the order below is AFFIRMED IN PART AND REVERSED IN PART.

SIMMS, C.J., and HARGRAVE and KAUGER, JJ., concur.

DOOLIN, V.C.J., and HODGES, LAVENDER and SUMMERS, JJ., concur in Part II, dissent as to Part I.

OPALA, J., concurs in Part I, dissents as to Part II.

OPALA, Justice, concurring in Part I and dissenting from Part II.

Part II of today's opinion announces that a *surviving spouse's statutory claim to a family maintenance allowance* [1] from the deceased spouse's estate *may now be effectively relinquished* if there are no minor or dependent children at death and the survivor's antenuptial waiver is clear, express and supported by adequate consideration. The court overrules the *In re Rossiter's Estate* [2] rule which made *unenforceable,* as against public policy, *all* antenuptial contractual waivers of a survivor's right to the family maintenance allowance.

I recede from the court's pronouncement in Part II because (a) I would make an antenuptial waiver of statutory family maintenance allowance, however effective as a contractual promise, avoidable by and hence *unenforceable* against a *destitute or needy* surviving spouse, even if there were *no* minor or dependent children at the time of death, and (b) I would not hold, as the court does today, that this widow's contractual waiver was effective. *Rossiter,* which was the law both when she entered into her antenuptial agreement on January 19, 1983

and when her husband died, made her promise *absolutely void.* The law in force at the time a contract is executed governs both its validity and effect. This widow is clearly entitled to have the efficacy of her contractual waiver of the family maintenance allowance measured by the legal norms which were in effect in January of 1983. [3] Today's overruling of *Rossiter* and the pronouncement of a new rule in Part II of the opinion ought to be given prospective application. This is so because *no* promise may ever *be enforced* if it was *unenforceable* when given. [4]

---

1. For the provisions of family maintenance allowance, see 58 O.S.1981 § 314.

2. *In re Rossiter's Estate,* 191 Okl. 342, 129 P.2d 856 [1942].

3. The law in force when an agreement was made governs its validity and effect. *Tom P. McDermott, Inc. v. Bennett,* Okl., 395 P.2d 566,

570 [1964] and *Nichols v. Callaway,* 200 Okl. 328, 193 P.2d 294, 296 [1948].

4. *American-First Title & Trust Company v. Ewing,* Okl., 403 P.2d 488, 496 [1965] and *Gibson v. Phillips University,* 195 Okl. 456, 158 P.2d 901, 903 [1945].